UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEKLA BALFOUR-BROWNE, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>EDEN FINE ART NY INC. d/b/a EDEN GALLERY, CATHIA KLIMOVSKY, GUY MARTINOVSKY, GAL YOSEF, and CETRA ART CORPORATION,<br><br>    Defendants. | Case No.: 1:25-cv-1142 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS EDEN FINE ART NY INC., CATHIA KLIMOVSKY, GUY MARTINOVSKY, GAL YOSEF, AND CETRA ART CORPORATION'S MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................... 3

III.    PROCEDURAL BACKGROUND............................................................................ 6

IV.     THE APPLICABLE LEGAL STANDARDS ......................................................... 7

V.      ARGUMENT ............................................................................................................ 8

        A.     Plaintiff Sufficiently Alleges the Existence of a Contract for the Creation of
               the Meta Eagle Club and Defendants' Breach ........................................... 8

               1.     Defendants' Statements Specified the Terms of the Offer ......................... 8

               2.     Defendants Failed to Deliver on Contractual Promises ........................... 13

               3.     The Statute of Frauds Does Not Apply Because the Contract Could
                      Have Been Performed In a Year and Writings Establishing the
                      Contract Exist ............................................................................................. 14

        B.     The Complaint States a Claim for Violation of GBL § 349 ............................... 16

               1.     The Defendants' Actions Clearly Emanated From New York and the
                      Transactions Took Place Here ................................................................... 16

               2.     Plaintiff Has Sufficiently Pleaded Cognizable Injury Under GBL
                      § 349............................................................................................................ 17

               3.     Plaintiff Adequately Alleges Exposure to Deceptive Statements............. 18

               4.     Plaintiff Has Plead Actionable Deceptive Statements .............................. 19

        C.     The Terms of Service Do Not Protect Centra ..................................................... 20

        D.     Jurisdiction Over Yosef Is Appropriate .............................................................. 22

        E.     Defendants' Request for Attorney's Fees is Unwarranted .................................. 24

VI.     CONCLUSION....................................................................................................... 26

WORD COUNT CERTIFICATION .................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*A.J. Richard & Sons, Inc. v. Forest City Ratner Cos.*, LLC,
    2019 NY Slip Op 30215(U) (Sup. Ct., Kings Cty., 2019) ................................ 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................ 7

*Barron v. Helbiz Inc.*,
    20 Civ. 04703 (LLS), 2023 U.S. Dist. LEXIS 155324 (S.D.N.Y. Aug. 31, 2023) ............ 12, 17

*Belfiore v. P&G*,
    94 F. Supp. 3d 440 (E.D.N.Y. 2015) ................................ 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................ 7

*Cerovene, Inc. v. Fukuzyu Pharm. Co.*,
    No. 24-CV-464 (RA), 2025 U.S. Dist. LEXIS 43236 (S.D.N.Y. Mar. 10, 2025) ............ 23

*Cline v. TouchTunes Music Corp.*,
    211 F. Supp. 3d 628 (S.D.N.Y. 2016) ................................ 17

*In re Columbia Tuition Refund Action*,
    523 F. Supp. 3d 414 (S.D.N.Y. 2021) ................................ 11

*Cotiviti, Inc. v. Deagle*,
    501 F. Supp. 3d 243 (S.D.N.Y. 2020) ................................ 25

*Cox v. Spirit Airlines, Inc.*,
    341 F.R.D. 349 (E.D.N.Y. 2022) ................................ 12

*Cox v. Spirit Airlines, Inc.*,
    786 F. App'x 283 (2d Cir. 2019) ................................ 12

*Cron v. Hargro Fabrics*,
    694 N.E.2d 56 (1998) ................................ 14

*Cruz v. Fxdirectdealer*,
    720 F.3d 115 (2d Cir. 2013) ................................ 16

*Dash v. Seagate Tech. (US) Holdings, Inc.*,
    27 F. Supp. 3d 357 (E.D.N.Y. 2014) ................................ 18

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013) ................................ 7

*Edmundson v. Klarna, Inc.*,
    85 F.4th 695 (2d Cir. 2023) ................................ 10

*Edwards v. Sequoia Fund, Inc.*,
    938 F.3d 8 (2d Cir. 2019) ................................ 8

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004)                                                  13

*Fremuth v. Stetson*,
    2017 NY Slip Op 30073(U) (Sup. Ct., N.Y. Cty., 2017        14

*Gallo v. Inter-Con Sec. Sys.*,
    20 Civ. 4879 (KPF), 2021 U.S. Dist. LEXIS 166061 (S.D.N.Y. Sep. 1, 2021)    25

*Goldemberg v. Johnson & Johnson*,
    8 F. Supp. 3d 467 (S.D.N.Y. 2014)    18, 19

*Goshen v. Mut. Life Ins. Co.*,
    98 N.Y.2d 314 (2002)    16

*Grupo Dataflux v. Atlas Global Group, L.P.*,
    541 U.S. 567 (2004)    6

*Gucci Am., Inc. v. Weixing Li*,
    135 F. Supp. 3d 87 (S.D.N.Y. 2015)    7

*Harper v. O'Neal*,
    746 F. Supp. 3d 1360 (S.D. Fla. 2024)    10

*Horowitz v. 148 S. Emerson Assocs. LLC*,
    888 F.3d 13 (2d Cir. 2018)    24

*Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*,
    694 F. Supp. 3d 374 (S.D.N.Y. 2023)    7

*Leonard v. Pepsico, Inc.*,
    88 F. Supp. 2d 116 (S.D.N.Y. 1999)    12

*Mantikas v. Kellogg Co.*,
    910 F.3d 633 (2d Cir. 2018)    20

*Matter of Part 60 Put-Back Litig.*,
    165 N.E.3d 180 (2020)    21

*Matter of People v. JUUL Labs, Inc.*,
    212 A.D.3d 414 (N.Y. App. Div. 1st Dept. 2023)    23

*Mohammed v. Juno Inc.*,
    2019 NYLJ LEXIS 912 (Sup. Ct. N.Y. Cnty. Mar. 26, 2019)    15

*Morrissey v. Nextel Partners, Inc.*,
    72 A.D.3d 209, 895 N.Y.S.2d 580 (3d Dep't 2010)    17

*Naldi v. Grunberg*,
    80 A.D.3d 1, 908 N.Y.S.2d 639 (1st Dept. 2010)    15

*Neurological Surgery, P.C. v. Aetna Health Inc.*,
    No. CV 19-4817 (DRH)(ARL), 2022 U.S. Dist. LEXIS 19744 (E.D.N.Y. Feb. 1, 2022)    24

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*,
    30 N.Y.3d 572 (2017)    21

*Ohanian v. Avis Rent A Car Sys., Inc.*,
  779 F.2d 101 (2d Cir. 1985) ........................................................................ 14

*Paulo v. Presse*,
  ACTION NO. 21 Civ. 11209 (JLR) (SLC), 2023 U.S. Dist. LEXIS 207171
  (S.D.N.Y. Oct. 17, 2023) ............................................................................. 26

*Perks v. TD Bank, N.A.*,
  444 F. Supp. 3d 635 (S.D.N.Y. 2020) ........................................................... 8

*Ransom v. Spacc*,
  57 Misc. 3d 259, 60 N.Y.S.3d 630 (City Ct., Chautaguqua Cty., 2017) ....... 11

*Resorb Networks, Inc. v. YouNow.com*,
  51 Misc. 3d 975, 30 N.Y.S.3d 506 (Sup. Ct., N.Y. County 2016) ............... 10

*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*,
  999 F.3d 828 (2d Cir. 2021) ........................................................................ 10

*St. John's Univ. v. Bolton*,
  757 F. Supp. 2d 144 (E.D.N.Y. 2010) .......................................................... 15

*Starke v. Squaretrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019) ........................................................................ 10

*Stidhum v. 161-10 Hillside Auto Ave, LLC*,
  19-CV-1625 (ARR) (RML), 2022 U.S. Dist. LEXIS 124958 (E.D.N.Y. July 14, 2022) ...... 24

*Stidhum v. 161-10 Hillside Auto Ave., LLC*,
  No. 19 CV 1625 (ARR)(RML), 2022 U.S. Dist. LEXIS 37993 (E.D.N.Y. Mar. 3, 2022) ...... 24

*Ward v. TheLadders.com, Inc.*,
  3 F. Supp. 3d 151 (S.D.N.Y. 2014) ....................................................... 11, 17, 21

*Yuille v. Uphold HQ Inc.*,
  686 F. Supp. 3d 323 (S.D.N.Y. 2023) .......................................................... 21

**Statutes**

GBL § 349 ................................................................................... 15, 16, 17, 19

General Obligations Law § 5-701(a)(1) ........................................................ 14

**Other Authorities**

Restatement (Second) of Contracts § 26 (1979) .......................................... 11

iv

Plaintiff Tekla Balfour-Browne files this memorandum of law in opposition to Defendants Eden Fine Art NY Inc. d/b/a Eden Gallery, Cathia Klimovsky ("Klimovsky"), Guy Martinovsky ("Martinovsky"), Gal Yosef ("Yosef"), and Cetra Art Corporation's (collectively, "Defendants") motion to dismiss (hereinafter, the "Motion" or "MTD"), ECF No. 16.[1]

## I.    <u>INTRODUCTION</u>

Defendants marketed their reputations as a world-renowned artist and an art gallery with trendy and upscale locations nestled among luxury brands.    They leveraged this air of sophistication to encourage Plaintiff and others to buy into their club.

Defendants recognize that the value of the Meta Eagle Club NFTs fell dramatically, but they have no excuse for why they failed to deliver on their specific promises to create a club with "exclusive perks and benefits in the world of luxury and fine art," nor can they explain what happened to the millions of dollars that they raised from club members.    Defendants could have created their club and distributed art to the members—in fact, Defendants have kept working together, promoting and selling Yosef's art.    They simply decided to perform a rug pull and take the Class's money instead.    And now they blame the victim, alleging that Plaintiff has buyer's remorse.

The Complaint contains plenty of specific representations by named Defendants that constitute contractual terms.    For example, Defendants published their "Roadmap"[2] laying out specific things that they would do with the money that they raised from the sale of the NFTs to create a club (the "Club") and provide benefits to members, such as hosting exclusive parties,

---

[1]    Unless otherwise indicated, capitalized terms have the same definition as in the Complaint (ECF No. 1).  Citations to "¶ _" are to the Complaint.  Unless otherwise indicated, all emphasis is added and all citations and quotations are omitted.

[2]    https://galyverse.io/#RoadMap

providing first class airfare to these parties, and conducting other events such as sky dives and "Zero G flights." ¶ 47. They continued to boast about these and other benefits to Club members who held onto their NFTs. ¶ 58. These were not simply promises about what they might do in the future or offers to negotiate—Defendants were clear that they supposedly were building the Club at the moment. *See, e.g.*, ¶ 61.

The Complaint also alleges that the scheme was centered in New York. As alleged, Defendant Yosef promoted the Meta Eagle Club and posted about its huge advertisement that appeared in Times Square, New York. ¶ 46. Evidently, he also made this post ***while he was in New York***. ECF 14 ¶ 6. The defendants are located, are organized, or reside in New York. ¶¶ 13-19. The Complaint also alleges that Plaintiff and other class members purchased the Meta Eagle Club NFTs on the OpenSea marketplace, which is headquartered in New York, so the transactions took place here. ¶ 10. Importantly, one of the only things that Defendants did for Meta Eagle Club members was to hold a party in the Eden Gallery location in SoHo, New York, which Yosef attended. ¶¶ 63-64. These facts clearly show that New York GBL § 349 applies, and that there is specific jurisdiction over Yosef.

Finally, Defendants' request for attorneys' fees and costs is unfounded. This action is not an example of vexatious litigation or forum shopping: it was filed in the same court and marked as related to the prior-filed litigation, and it is now before the same Judge. Importantly, Defendants have not pointed to a single thing that they would have done differently if the Complaint in this action were to have been filed as an amended complaint in the prior-filed action.

II.    **FACTUAL BACKGROUND**

Defendants created, owned, operated, and controlled the Meta Eagle Club as a digital venture, with the "Team" comprised of Defendant Yosef and "Eden Gallery". ¶ 27.[3] The Eden Gallery website and press releases repeatedly touted its partnership with Yosef and its central role in developing and delivering Meta Eagle Club benefits. ¶ 31.

To join the Meta Eagle Club, members bought a Meta Eagle Club NFT, which was supposed to serve as a membership card. ¶ 32. The Club's website promised that "Owning an Eagle grants you access to unique experiences, NFT airdrops, significant collaborations, and many more exclusive benefits, including real life luxury events powered by Eden Gallery". *Id.*

Defendants marketed the Club and NFTs aggressively through websites, social media, and Discord, making repeated statements about the development, longevity, and long-term ecosystem of the Meta Eagle Club and Galyverse. ¶¶ 3, 34-35. The website described the Club as offering "exclusive perks and benefits in the world of luxury & fine art," including "exclusive events in Eden Galleries around the world, Physical art raffles, Flight experiences, Metaverse and of course the Galypoints system." ¶ 40. Purchasing a Meta Eagle Club NFT was the only way to access these exclusive benefits. ¶¶ 39 - 40

Defendants cultivated a sense of community through events like "Ask Me Anything" sessions and Discord announcements, where they detailed promised benefits and forthcoming "roadmaps". ¶¶ 41-45. For example, on December 23, 2021, Defendants, through their agent Kiseliov, stated: "this is the first collection in his own metaverse, creating a long term never before seen quality art and ecosystem. Helicopter flights. Hot Air Balloon First Class/Business plane

---

[3] The "Eden Gallery" referred to is specifically identified as Defendants Klimovsky, Eden Fine Art, Martinovsky, and Cetra Art. ¶ 28.

tickets to exclusive events. Do you know what they all have in common? They are all part of the road map." ¶ 42.  On the same day, Defendants announced plans to buy land in the Sandbox Metaverse and to create a custom metaverse "using an advanced game engine, exclusive for Meta Eagles to hang out and fly together." ¶ 43.

In January 2022, Defendants published the Meta Eagle Club Roadmap on the Club's website, promising access to in-person events with artists, a custom metaverse, and exclusive experiences such as VIP flights, hot air balloon rides, and more. ¶ 47.  The Roadmap included specific, detailed benefits: "Donating 100,000 USD for eagles protection; Exclusive physical artworks by Gal Yosef; Business/First class flights tickets to events; IRL RNSNC x EDEN worldwide events/shows with artists; Hot air balloon flights; Private jet flights to IRL events; Meta Eagle NFT Airdrops; Helicopter flights; Sky diving jumps; Exclusive physical artworks and collectibles; Custom Meta Eagle Club Metaverse; Artist meet up in the Metaverse; and Zero G flights." *Id*.  The Club was described as "the first chapter in the Galyverse," an "advanced eco system embracing the Metaverse." ¶ 48.

On February 7, 2022, Defendants began selling 12,000 Meta Eagle Club NFTs for Ether cryptocurrency, raising over $13 million in the "Mint" ¶¶ 49, 51.  The NFTs quickly sold out, and a 10% royalty provision ensured Defendants would continue to profit from all secondary sales. ¶ 52.  Defendants continued to promote the Club's longevity and the binding nature of the Roadmap, tweeting: "We've carefully constructed a roadmap that includes short and long term milestones. Our main goal is longevity - we are here to stay and aim for the absolute top." ¶ 53.

Defendants' statements in AMAs and other public forums reinforced their long-term commitment.  For example, Defendant Yosef declared: "The bottom line, we see the long run, we really don't see a short run . . . We have a huge marketing plan and we have a huge plan for the

future, *for let's say for a full year almost*. . . We see this project as a way to build a long-term relation with today's 6000 people." ¶ 55. He also emphasized that the Roadmap included "utilities to flights to parties," and promised "very luxury exhibitions and luxury events." *Id*. Defendant Martinovsky similarly assured the community of ongoing benefits and the development of the metaverse, physical art, and other utilities. ¶¶ 56-57.

Defendants continued to assure members of the Club's value and ongoing development after the Mint, including statements about NFT prices and further benefits. ¶¶ 60-61. On March 1, 2022, Defendant Yosef stated that they were already investing the money into the project: "The money we are investing, and we will keep invest[ing] will happen anyways, but when we will achieve the goal depends on the community." ¶ 60. On March 3, 2022, Defendants claimed that the metaverse development was "before schedule," with delivery expected in Q2. ¶ 62. The Club held in-person events at Eden Gallery's New York and Miami locations, further reinforcing the link between the Club, Eden Gallery's brand, and the promised benefits. ¶¶ 63-65.

Despite these promises, Defendants failed to deliver. By June 30, 2022, Defendants admitted they were merely negotiating with third parties to provide a metaverse, contradicting earlier representations that land had already been acquired and development was underway. ¶¶ 68-70. After July 2022, Defendants provided no meaningful updates, and by January 2023, they had delivered only a handful of the promised benefits. ¶ 72. Defendants received more than $13 million while providing only a fraction of the promised benefits. ¶¶ 73, 144. The embedded royalty provision further enriched Defendants at the expense of Club members, and illustrated their ongoing relationship. ¶ 52.

By April 2023, Defendants ceased all communications, but continued to operate the Meta Eagle Club website and invite the public to purchase NFTs. ¶¶ 77-78.

As a result of Defendants' actions, the value of Meta Eagle Club NFTs collapsed, leaving Plaintiff and the Class with worthless assets and substantial financial losses, ranging from $1,099.86 to over $45,990 per NFT.  ¶¶ 79-80.  Meanwhile, Defendants continued to promote Yosef's artwork and Eden Gallery's brand outside the Meta Eagle Club context, demonstrating that their business relationship persisted even as they abandoned their obligations to Club members.  ¶¶ 81-83.

III.    **PROCEDURAL BACKGROUND**

Plaintiff filed a related prior action on October 9, 2024, which was assigned to this Judge.  *Aamer, et al. v. Eden Gallery Group Ltd., et al.*, Case No. 1:24-cv-07678 (S.D.N.Y.) ("*Aamer* action").  That case addressed similar facts, defendants, allegations, and legal counsel.  Defendants moved to dismiss the *Aamer* action, and the plaintiffs negotiated a schedule for filing an amended complaint in response to their arguments by February 7, 2025.  *Aamer* action, ECF No. 28.

Plaintiff filed this action on February 7, 2025.  ECF No. 1.  As Plaintiff explained to the Court, this case was filed as a separate class action in order to address fundamental jurisdictional concerns that could not be cured through a simple amendment to the *Aamer* action's complaint.  ECF Nos. 3-4.  Specifically, this approach was taken to "mitigate any concern that jurisdiction did not exist at the time of filing of the action".  ECF No. 4.  This reasoning is firmly grounded in established Supreme Court precedent.  *See Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 571 (2004) (jurisdiction must exist at the time of filing and cannot be retroactively created through amendment).

Far from attempting to circumvent the Court's authority, Plaintiff acted with complete transparency by immediately filing a Statement of Relatedness, explicitly identifying the connection between the two actions.  ECF No. 3.  This action demonstrates Plaintiff's good faith effort to ensure that both matters would be coordinated before the same judge.  The Statement of

Relatedness explicitly detailed the substantive connections between the cases while acknowledging their procedural and substantive differences.

Furthermore, the as Plaintiff informed the Court, the "complaint will be treated as if the right to amend as a matter of course pursuant to Rule 15(a)(1) has already occurred," and any amendment "will be sought through leave of court or written consent of the" Defendants pursuant to Rule 15(a)(2). ECF No. 5. As such, the current complaint is equal to an amended complaint in *Aamer*.

## IV.    THE APPLICABLE LEGAL STANDARDS

At the dismissal stage, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "A claim has facial plausibility when the pled factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663. The court "must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, 694 F. Supp. 3d 374, 384 (S.D.N.Y. 2023). All that is required is "a short and plain statement" sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Further, on a motion to dismiss, Plaintiff needs make only a "*prima facie showing*" of personal jurisdiction over Yosef, which may be supported "solely by allegations." *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013). The Court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Id*. Specific personal jurisdiction is proper when (1) the defendant "has sufficient 'minimum contacts' with the forum" and (2) "the exercise of jurisdiction under the circumstances [i]s 'reasonable.'" *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 96 (S.D.N.Y. 2015).

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 13 (2d Cir. 2019); *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 639-40 (S.D.N.Y. 2020) (on Rule 12(b)(6) motion "[a]ny contractual ambiguities must be resolved in the plaintiff's favor").

## V.    ARGUMENT

### A.    Plaintiff Sufficiently Alleges the Existence of a Contract for the Creation of the Meta Eagle Club and Defendants' Breach

Defendants made specific and tangible promises that they would create an exclusive club and provide material benefits to the Meta Eagle Club members. They then breached the contract by failing to actually create the club like they were supposed to and abandoning the project.

#### 1.    Defendants' Statements Specified the Terms of the Offer

The Complaint alleges that the Defendants contracted to create the exclusive Meta Eagle Club and provide membership to anyone who held a Meta Eagle Club NFT. *See, e.g.*, ¶ 96 ("An enforceable contract exists between Plaintiff and the Class, on the one hand, and the Defendants, on the other hand, in that they agreed on a contract for membership in the Meta Eagle Club[.]"). Plaintiff and the Class fulfilled their obligations and purchased all of the limited-release Meta Eagle Club NFTs. ¶ 51.[4] Plaintiff alleges that the Defendants breached this contract because they had no real plans for the development of the Club. ¶ 7 ("Defendants had no plans for the future of

---

[4] Defendant notes that Plaintiff did not purchase his NFTs in the original Mint. As alleged in the Complaint, subsequent purchases of the NFTs were designed to pay the Meta Eagle Club team 10% of the purchase price in "royalty" payments through the operation of the smart contract. ¶ 52. Therefore, there is a continuing contractual relationship between the Defendants and each subsequent purchaser, including Plaintiff. *See, e.g.*, DeFiLLama.com, https://defillama.com/nfts/royalties/0xeb6dffb87315a2bdf4dedf72b993adc960773a0d (showing $1.3 million in royalty payments).

Meta Eagle Club NFTs aside from profiting off the excitement around the digital asset."). This is a quintessential rug pull.

Defendants have no argument that they did not form this part of the contract.

The Complaint also alleges the Defendants contracted to provide exclusive and luxurious benefits to the Meta Eagle Club members. *See, e.g.*, ¶ 96 ("[T]hey agreed on a contract . . . for Defendants to provide promised benefits to members of the Meta Eagle Club in exchange for members purchasing Meta Eagle Club NFTs."). These terms were set out in the public statements by Defendants on the website and social media platforms. Defendants breached this portion of the contract by abandoning the project and not providing these benefits. ¶ 103.

The Defendants argue that the terms of the benefits provided by the Club are too vague, and are "more akin to an effort to build excitement about the project." Def. Br. at 9-10.[5] However, Defendants do not say which of the provisions are not specific enough for a reasonable consumer. In fact, Defendants' "Roadmap 1.0" and "Roadmap 2.0" specified deliverables (e.g., physical artwork, $WING tokens, VIP events) with precise timelines and channels of communication (Discord, Twitter), evidencing intent to bind. ¶¶ 31, 42, 45-47, 57-59. The repeated use of the term "Club" in promotional materials signaled a formal, ongoing relationship akin to traditional membership organizations. The Club's website explicitly tied NFT ownership to membership status, declaring: "Owning an Eagle ***grants you access*** to unique experiences, NFT airdrops, significant collaborations, and many more exclusive benefits, including real life luxury events powered by Eden Gallery." ¶ 32. The automatic nature of the statement that owning a Meta Eagle Club NFT "grants you access" to the Club also shows that this is an offer. Defendants represented

---

[5]     References to specific pages in Defendants' Memorandum of Law in Support of Motion to Dismiss (ECF No. 16), are cited to herein as "Def. Br. at __."

that the investments in the Meta Eagle Club had already started, and were not simply promises of future benefits.  ¶ 61 ("The money we are investing, and we will keep invest[ing] . . .").  Here, Defendants' promises—such as "physical artwork by Gal Yosef" and "private jet flights"—go beyond vague aspirations and instead mirror the type of "definitive commitments" courts recognize as enforceable.  ¶ 47.  Notably, within the digital asset space, project and promotors use "whitepapers" and "roadmaps" as the primary methods of outlining what a project can deliver.  *See, e.g.*, *Harper v. O'Neal*, 746 F. Supp. 3d 1360, 1375 (S.D. Fla. 2024) (finding NFT and token project was a security based, in part, on the statements made in the project whitepaper).  The membership model's structure, which required purchasers to buy NFTs for access to benefits, functionally served as acceptance and consideration, satisfying basic contract formation principles.

When analyzing online contracts, courts have routinely inquired whether "a 'reasonably prudent' person would be on inquiry notice of those terms."  *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 834 (2d Cir. 2021); *see also Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023) ("A reasonably prudent internet or smartphone user is on inquiry notice of contractual terms where the terms are presented in a clear and conspicuous way."); *Starke v. Squaretrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) ("In the context of web-based contracts, we look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms."); *Resorb Networks, Inc. v. YouNow.com*, 51 Misc. 3d 975, 981, 30 N.Y.S.3d 506, 511 (Sup. Ct., N.Y. County, 2016) (enforceable online agreements must "must be designed such that a 'reasonably prudent user' will be placed on 'inquiry notice' of the terms of using the website" and "the design and content of the website must encourage the user to examine the terms clearly available through hyperlinkage" (cleaned up)).  The Roadmap that was (and still is) front and center on the Meta

Eagle Web page, and referred to repeatedly in the social media statements by Defendants, easily satisfies putting a reasonably prudent person on inquiry notice of the contract's term.

Defendants argue that their statements actually constitute advertisements, not offers, but they are wrong. As the commentary for the Restatement (Second) of Contracts § 26 (1979) illustrates, a few important words can transform an advertisement to an offer. For example, advertising "overcoats of a certain kind for sale at $ 50" is not an offer, while adding terms that limit the supply such as "Out they go Saturday; First Come First Served" transforms it into an offer. Restatement (Second) of Contracts § 26 cmt. b (1979). Here, the Defendants limited the membership to the holders of the 12,000 Meta Eagle Club NFTs. ¶¶ 4, 49; *see also* galyverse.io/about-project (available at perma.cc/PCN4-RY9N) (noting that there are only 12,000 NFTs available). Similarly, the next illustration shows that if an advertiser says "he will pay $ 5 for every copy of a certain book that may be sent to him," this is an offer. Restatement (Second) of Contracts § 26 cmt. b (1979). The NFTs were each unique—i.e., "a certain book"—and that holding one "grants you access" to the Club. This is clearly an offer within the guidelines of the Restatement.[6] Importantly, the statements to the public were not simply invitations to negotiate because Plaintiff completed the actions necessary to join the Club by purchasing the NFTs. *See*

---

[6]    *A.J. Richard & Sons, Inc. v. Forest City Ratner Cos.*, LLC, 2019 NY Slip Op 30215(U) ¶ 18 (Sup. Ct., Kings Cty., 2019) (enforcing a letter of intent as a binding contract because it used mandatory language ("shall," "will") and outlined material terms, even while anticipating future formalization); *Ransom v. Spacc*, 57 Misc. 3d 259, 60 N.Y.S.3d 630 (City Ct., Chautauqua Cty., 2017) (enforcing contract created by job posting); *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 424-28 (S.D.N.Y. 2021) (sustaining breach of contract claims for specific representations on websites about services and facilities that would be provided); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 159 (S.D.N.Y. 2014) (finding the website included "contractual language [that] described specific actions to be taken by the defendant").

*contra Leonard v. Pepsico, Inc.*, 88 F. Supp. 2d 116, 124 (S.D.N.Y. 1999) ("There would be no enforceable contract until defendant accepted the Order Form and cashed the check.").[7]

Furthermore, it is clear from the allegations in the Complaint that the Defendants themselves treated the features and benefits of the Club outlined in the Roadmap as actionable commitments. In January 2023, the Defendants reached out to the community for input on whether or not to keep the originally-outlined benefits or to provide some other benefit; the roadmap was what they saw as the agreement. ¶¶ 74-75 (listing specific "utilities" from the Roadmap and proposing alternatives that were "other community centered utilities"). Not providing these utilities was enough of a change from their agreement that Defendants informed the community. These statements were clearly not just "puffery."

Defendants' reliance on *Barron v. Helbiz Inc.*, 20 Civ. 04703 (LLS), 2023 U.S. Dist. LEXIS 155324 (S.D.N.Y. Aug. 31, 2023) is misplaced. MTD at 10. Unlike the vague "future plans" in *Barron*, the Complaint details concrete deliverables (e.g., token distributions, IRL events) with timelines and channels for enforcement. The membership model's explicit terms and Defendants' partial performance (e.g., hosting initial events) further negate claims of vagueness and indefiniteness.[8]

---

[7] To the extent that the Court finds that the provisions are ambiguous, the contract claim is not dismissible. *Cox v. Spirit Airlines, Inc.*, 341 F.R.D. 349, 355 (E.D.N.Y. 2022) (denying summary judgment on contract claim where "price" term was ambiguous, pursuant to prior Second Circuit decision in the case (citing *Cox v. Spirit Airlines, Inc.*, 786 F. App'x 283 (2d Cir. 2019)).

[8] Unlike the specific Roadmap in this case, the complaint in the *Hellbiz* case included a general description of the "tokenomics" for the coin issued by the company and broad statements about the company's business plan in the unspecified future. *Barron v. Helbiz Inc.*, 1:20-cv-04703-LLS, Complaint at ¶ 33 (ECF No. 3) (S.D.N.Y. June 19, 2020) (describing goals such as "integrat[ing] several services in one single platform," creating a system to "allow users to convert major cryptocurrencies into [the issued cryptocurrency] at the current exchange rate," and describing "THE HELLBIZ ECONOMIC MODEL"). These are not benefits that the purchasers of the Hellbiz coins would receive in exchange for their investment.

The high purchase price of Meta Eagle Club NFTs are not characteristic of casual or speculative transactions; rather, they demonstrate a serious investment.  Furthermore, the initial price of the Meta Eagle Club NFTs was set out clearly on the website:  0.35 ETH (or approximately $1,099.86 at the time of the Mint).  And, the smart contract that controls the NFT was designed to send 10% of the subsequent sales to the Defendants.  ¶ 52.

The Complaint therefore clearly shows that the price terms were set by the Defendants. But, even if they were not, the lack of a price term does not mean that there is no contract. N.Y. U.C.C. § 2-305(1) ("The parties if they so intend can conclude a contract or sale even though the price is not settled.").

## 2.    Defendants Failed to Deliver on Contractual Promises

The Complaint sufficiently alleges that the Defendants all are parties to the contract:  the Meta Eagle Club "Team" was Yosef and Eden Gallery, while Klimovsky and Martinovsky controlled Eden Gallery and Centra.  ¶¶ 27-31.

The Complaint alleges that, after Plaintiff bought Meta Club NFTs (in performance of his end of the contract), the Defendants did not do what they said that they were going to do, and the value of the NFTs collapsed as a result.  ¶¶ 68-83.  The Complaint also alleges that Yosef and Eden Galleries could have continued to provide the art and other benefits that they promised to the Meta Eagle Club members since they have continued to work together, promoting and selling Yosef's work in the Eden Gallery spaces.  *See generally Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004) (A "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.").

Defendants argue that by asking the remaining members what to do with a small amount of funds means that it is not their fault and that "it was the NFT holders themselves" who caused

the project to fail.  Def. Br. at 12.  Plaintiff will explore the factual circumstances surrounding this change in priority through discovery.[9]  But Defendants are not absolved of liability just because they asked the Club members how they wanted to carve up the crumbs that were left.

3.    **The Statute of Frauds Does Not Apply Because the Contract Could Have Been Performed In a Year and Writings Establishing the Contract Exist**

New York courts narrowly interpret General Obligations Law § 5-701(a)(1)'s one-year rule, requiring absolute impossibility of performance within a year to trigger the Statute of Frauds. *See Fremuth v. Stetson*, 2017 NY Slip Op 30073(U), ¶ 6 (Sup. Ct., N.Y. Cty., 2017); *Cron v. Hargro Fabrics*, 694 N.E.2d 56 (1998) (statute of frauds did not apply to oral contract that could have been completed in one year).  Contrary to Defendants' arguments, the statute of frauds does not apply if any lawful method of termination exists within a year, even if performance is unlikely. *Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101 (2d Cir. 1985).  Here, the Complaint details multiple obligations with discrete completion timelines.  In Roadmap 2.0, the various forecasted events would be over by Q3 2022.  ¶ 58.  These staggered deliverables created sequential performance obligations, each independently satisfiable within 12 months.  In fact, Yosef said that they "have a huge plan for the future, for let's say *for a full year almost*."  ¶ 55; *see also* Def. Br. at 14 (quoting the same speech from Yosef but omitting the emphasized language in the statute of frauds discussion).  As the terms set out by the Defendants show, the contract could have been performed within a year, and that is sufficient to avoid the statute of frauds.

---

[9]    While the Defendants point to the crypto market as a whole to distract from the failure of their product within months, there is little support for this claim—their own cited article says that, as of September 2023, only 18% of the NFTs issued were "dead" like the Meta Eagle Club NFTs  See https://markets.businessinsider.com/news/currencies/nft-market-crypto-digital-assets-investors-messari-mainnet-currency-tokens-2023-9.

Even if the Statute of Frauds did apply, the Defendants issued a series of writings on multiple platforms that set out the terms of the offer and the contract. Most importantly, the Roadmap was first published on the Meta Eagle Club website in January 2022. ¶ 47. The Meta Eagle Club website referred Club members to purchase the NFTs on the OpenSea platform, and the OpenSea website directs purchasers back to the Meta Eagle Club website for more information about the project.[10] And the terms of the sale were inscribed in the "smart contract" behind the NFT.

Defendants continually referred to the Roadmap in different online writings. ¶¶ 53-56. They then published the updated Roadmap 2.0 on the Meta Eagle Discord (¶ 58), and continued to promote the sales of the NFTs, the progress on the schedule, and the promised "utilities" on various platforms, including the Meta Eagle Club website (¶¶ 59-70). Each of these platforms included timestamps and user authentication, showing the Defendants were the speakers and when they spoke. These modern communication styles are sufficient to satisfy the requirements of the statute of frauds. *See Naldi v. Grunberg*, 80 A.D.3d 1, 13, 908 N.Y.S.2d 639, 647 (1st Dept. 2010). Thus, these writings collectively outline essential terms: parties (Yosef/Eden Gallery/Meta Eagle Club), subject matter (NFT club membership and benefits), and consideration (ETH payments).

The statute of frauds cannot shield Defendants from contractual obligations they repeatedly authenticated through electronic writings.[11]

---

[10]    *Compare* https://opensea.io/assets/ethereum/0xeb6dffb87315a2bdf4dedf72b993adc960773a0d/5020, "About Meta Eagle Club – THE COLLECTION"; *with* https://galyverse.io/about-project, available at https://perma.cc/PCN4-RY9N. *See also* ¶ 40 ("Join Meta Eagle Club today by purchasing an eagle on Opensea.").

[11]    Plaintiff's claim for unjust enrichment is pled in the alternative to the other claims, including the breach of contract claim, and should not be dismissed at this stage. *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 183 (E.D.N.Y. 2010); *see also Mohammed v. Juno Inc.*, 2019 NYLJ LEXIS 912, at *24 (Sup. Ct. N.Y. Cnty. Mar. 26, 2019) (denying motion to dismiss unjust

**B.     The Complaint States a Claim for Violation of GBL § 349**

      **1.     The Defendants' Actions Clearly Emanated From New York and the Transactions Took Place Here**

Defendants agree that GBL § 349 applies to plaintiffs located outside of New York when there is a sufficient nexus to New York, including that the transactions took place in New York. Def. Br. at 16-17 (citing, *inter alia*, *Cruz v. Fxdirectdealer*, 720 F.3d 115 (2d Cir. 2013), *Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314 (2002)).  This includes promotional activities and statements by Defendants that emanate from New York:  "[O]ur reading of *Goshen* and the cases construing it leads us to conclude that a deceptive transaction in New York falls within the territorial reach of section 349 and suffices to give an out-of-state victim who engaged in the transaction statutory standing to sue under section 349."  *Cruz*, 720 F.3d at 123.

As the Complaint alleges, Defendants directed the Class to purchase their Meta Eagle Club NFTs on the OpenSea platform.  ¶ 40; *see also* https://galyverse.io/about-project, available at https://perma.cc/PCN4-RY9N (including links to OpenSea).  Accordingly, Plaintiff purchased his own NFTs on OpenSea.  ¶ 11.  The OpenSea marketplace is headquartered in New York, New York. ¶ 10.  Therefore, the transactions took place in New York.

Furthermore, Courts have interpreted the nexus requirement broadly.  The issuance of false and misleading statements from New York can be sufficient to apply GBL § 349 to out-of-state plaintiffs. As the *Cruz* court discussed, only "***some part*** of the underlying transaction" has to take place in New York.  720 F.3d at 124; *id.* at 123-24 (all customer communications were routed to the New York office).  As the Court in *Hellbiz* noted when it applied GBL § 349 to out-of-state plaintiffs, "Defendants sent out deceptive communications from websites registered to New York-

_____

enrichment claim).  The breach of the duty of good faith and fair dealing is in the alternative as well.

based addresses, held marketing events in New York to (fraudulently) promote their coin, and administered the ICO website in the state, and perpetrated other aspects of their conspiracy from within New York." *Helbiz Inc.*, 2023 U.S. Dist. LEXIS 155324, at *22-23; *see also Ward*, 3 F. Supp. 3d at 168 (deceptive practices in New York included relevant communications with defendants); *Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628, 632-33 (S.D.N.Y. 2016) (a deceptive transaction in New York falls within the territorial reach of § 349 and suffices to give an out-of-state victim who engaged in the transaction statutory standing to sue under § 349); *Morrissey v. Nextel Partners, Inc.*, 72 A.D.3d 209, 895 N.Y.S.2d 580 (3d Dep't 2010) (identical documents created a transactional nexus to the state for out-of-state plaintiff).

Clearly the promotion of the Meta Eagle Club took place in New York. Yosef promoted the Meta Eagle Club characters on display in Times Square (¶ 46), one of the most iconic "New York" venues possible, the same month that he arrived in the City (ECF 14 ¶ 6). Eden Fine Art and Centra both have their principal place of business in New York, while Klimovsky and Martinovsky have a residence in New York. ¶ 9. But perhaps most importantly, one of the only steps that Defendants took to partially benefit the Meta Eagle Club was to have a party at Eden Fine Art's SoHo gallery, which at least Yosef attended. ¶¶ 63-64. This was a major event in the life of the project because it allowed the Defendants to deceive potential and current Club members into thinking that they would actually follow through with their plan and have a club with IRL events at fancy galleries. These facts sufficiently show that the transactions and the deception came from New York.

**2.    Plaintiff Has Sufficiently Pleaded Cognizable Injury Under GBL § 349.**

Defendants take an overly-narrow view of the damages allegations in the Complaint. As the court in *Goldemberg v. Johnson & Johnson* explained, a claim properly alleges damages under

GBL § 349 if it combines the theory that the misrepresentations caused them to purchase the product and that the price was inflated.  8 F. Supp. 3d 467, 481 (S.D.N.Y. 2014).  The Complaint clearly states that Defendants made "false statements *to inflate the price* of Meta Eagle Club NFTs."  ¶ 134.  Furthermore, the NFT was designed so that the Defendants were supposed to receive 10% royalty payments from the subsequent market prices.  *Id.*  Their continued pumping of the NFTs therefore directed a flow of payments to Defendants.  Further, the Complaint claims that Plaintiff and the Class have been injured based on the crash of the market prices.  ¶¶ 79, 137.

### 3.    Plaintiff Adequately Alleges Exposure to Deceptive Statements

The Complaint describes in detail the misleading statements that Defendants made to promote the Meta Eagle Club across multiple channels.  The statements are not just made on the public website, but importantly they were made to the particular groups on Discord that were built for members of the Club.  The goal was to strengthen the "community" through discussions in these forums and hiring "Community Managers" to help spread the message.  *See, e.g.*, ¶¶ 34-38.  Defendants made repeated statements about creating this group of people.  *See, e.g.*, ¶ 43 ("Bringing the community together is one of our most important values"); ¶ 58 ("exclusive for Meta Eagles to hang out and fly together"); ¶ 61 ("This is the only thing that I care [about] right now—to have the trust of the community. And if you have the trust of the community, everything will be okay.").

The whole point was to create a group of people in a club and encourage them based on the Defendants' statements.  And, as a holder of Meta Eagle Club NFTs, Plaintiff became a member of that Club.  It is reasonable to assume that he and the Class was aware of and relied on the misleading statements.  *Dash v. Seagate Tech. (US) Holdings, Inc.*, 27 F. Supp. 3d 357, 361 (E.D.N.Y. 2014) ("The reasonable inference to be drawn from such allegations is that Plaintiff saw the misleading statements and, as a result of such, purchased the Drive at issue."); *accord.*

*Goldemberg*, 8 F. Supp. 3d at 480 ("The reasonable inference to be drawn from these allegations is that Plaintiff saw the Aveeno website and Facebook page described previously in the Complaint, and was thus deceived into purchasing the products in question."); *Belfiore v. P&G*, 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015) (same).

### 4.    Plaintiff Has Plead Actionable Deceptive Statements

The Complaint adequately describes how the Defendants' statements were misleading: they were supposedly creating a club with plenty of benefits, but they were not.  The Complaint also details how there was no plausible way for the Defendants to do what they proposed to do based on their track record and the skills and experience (or lack therof) of their team.  *See, e.g.*, ¶¶ 123-135.  The fact that Yosef and Eden Fine Art have continued with their relationship, with the gallery continuing to promote and sell his works, shows that there is no reason why they could not have held to their promises and created art for the Meta Eagle Club.  This easily satisfies GBL § 349.

Instead, the Defendants point to the Terms of Service as a supposed disclaimer that warned the Club members not to be fooled.  Def. Br. at 19-20.  As noted in Section C, *infra*, the Complaint specifically alleges that there is no evidence that any Meta Eagle Club member ever accepted these Terms of Service, and therefore would not be bound by them.

However, in any event, these disclaimers—which are dated after the Mint—do not absolve Defendants.  ***First***, Defendants argue in their brief that Plaintiff simply has buyer's remorse after purchasing art work and the market collapsed.  Def. Br. at 2.  In other words, this was a speculative investment gone bad.  However, the first disclaimer that they point to says that they are "not intended for speculative use."  ***Second***, the disclaimers warn that "NEW REGULATIONS OR POLICIES" may impact the utility of the NFTs.  Def. Br. at 20.  There is no suggestion that the regulatory environment shifted in this time frame.  Nor is there any suggestion that interest in the

19

Club declined precipitously just months after the members spent $13 million to get it started. *Third*, the disclaimers warn that the fluctuations in the exchange price of cryptocurrencies could affect the value of the NFTs. Def. Br. at 20. However, the exchange rate for ETH to USD did not collapse like the Meta Eagle Club NFTs' value did.

Finally, even considering these disclaimers, they have to be evaluated in the context of the entire set of information that the consumer considers. As the Second Circuit pointed out in *Mantikas v. Kellogg Co.*, even disclaimers about the total amount of whole grain in a cracker did not mean that the entire package was not misleading, when considering all information together. *See, e.g.*, *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636-39 (2d Cir. 2018) ("the misleading quality of the message is not effectively cured by implicitly disclosing the predominance of enriched white flour in small print on an ingredients list on the side of the package").

### C.    The Terms of Service Do Not Protect Centra

There are plenty of problems with Defendants Centra and Klimovsky seeking to hide behind the Terms of Service. *First*, as the Complaint noted in footnote 2 to Paragraph 14, there is no indication anywhere that any Club member had to consent to, or approve of, these Terms of Service in order to become a member of the Meta Eagle Club. There was no indication of any checkbox or affirmative steps that had to be taken by Club members, and Defendants proffer no evidence on this point. And, of course, even if it did bind Plaintiff and other Club members, it would only apply to Defendants Centra and Klimovsky.[12]

---

[12]    The Terms of Service submitted by Defendants (ECF No. 15-1) are also dated "May 2022." Plaintiff purchased his NFTs between February 7, 2022 and April 18, 2022 (¶ 11), before these Terms of Service could have bound him (or other Class members who purchased before May 2022). Defendants have submitted no evidence of Terms of Service that existed starting when the NFTs were first offered for sale in February 2022.

**Second**, while courts may sometimes allow terms of service to **limit** a defendant's liability, this document attempts to erase **all** liability and damages.[13]  As the court in *Ward* noted, provisions that "contradicted the earlier representation" should be construed against the drafter pursuant to *contra proferentum.  Ward*, 3 F. Supp. 3d 151 at 160-61.  Defendants claim that these terms bar claims for "any damages whatsoever" based on the NFTs.  Def. Br. at 23.  However, as alleged in the Complaint, Defendant Yosef made specific statements to the Meta Eagle Club members to rally together to keep up the "floor" price (i.e., the lowest resale price for the NFTs in the collection) and retweeted his compatriots' statements of high-water mark sales.  ¶¶ 60-61.  Defendants cannot pump the price of the NFTs and expect that they can simply waive their liability for damages.

Plaintiff also alleges that the "team" behind the Meta Eagle Club and the sale of the NFTs was Yosef and Eden Fine Arts (which includes Klimovsky and Martinovsky, and their entity Cetra).  ¶¶ 27-31, 49.  Defendants claim that the only entity that actually sold the NFTs was Cetra—the entity owned and controlled by Martinovsky and Klinovsky—and that no other Defendant profited.  Def. Br. at 22.  However, the only basis for this claim is the Terms of Service, which were dated May 2022—months after the Mint of the NFTs.[14]  Nor is there any statement in

---

[13]    Notably, the two decisions cited by Defendants only "limit" damages to certain remedies. See *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 30 N.Y.3d 572, 581 (2017) (the sole remedy is limited to cure or replacement of mortgages in a trust); *Yuille v. Uphold HQ Inc.*, 686 F. Supp. 3d 323, 354 (S.D.N.Y. 2023) (same).  The eradication of "any damages whatsoever" in these terms is likely against New York public policy.  *See, e.g.*, *Matter of Part 60 Put-Back Litig.*, 165 N.E.3d 180, 186 (2020) ("[I]t is well settled that public policy forbids a party's attempt to escape liability, through a contractual clause, for damages occasioned by 'grossly negligent conduct.").

[14]    There is no indication in the "smart contract" that sold the NFTs that the only beneficiary was Cetra.

Yosef's declaration that he did not profit from these sales. ECF No. 14. Regardless, this is a factual issue that will be explored in discovery, and not at the motion to dismiss stage.

### D.    Jurisdiction Over Yosef Is Appropriate

Plaintiffs clearly have specific jurisdiction over Yosef because he was centrally involved in the promotion of the entire Meta Eagle Club while he was in New York. As Yosef's declaration states, he "arrived in New York in January 2022." ECF 14 ¶ 6. This is just about the time that the project started to get off the ground. *E.g.*, ¶¶ 42-43 (noting early statements posted to Discord on December 23, 2021); ¶ 44 (January 2022 statements). In fact, Yosef's first statement described in the Complaint was on January 26, 2022, when he posted "Eagles have landed in Times Square! Meta Eagle Club NFT collection is almost out, stay tuned!" ¶ 46.

Yosef's declaration also stated that he "stayed in New York for a few months." ECF 14 ¶ 6. Therefore, evidently, Yosef remained in New York during the most active time that he was promoting the Meta Eagle Club. ECF 14 ¶ 7. In this time frame, Yosef in particular participated in the February 18, 2022 AMA on Twitter Spaces (¶¶ 54-55), posted March 1, 2022 promotional messages on X (¶ 60), and held an additional AMA on March 2, 2022 (¶ 61). He likely was involved further behind the scenes, since he told the community "We are here to work and work really hard." *Id.* He was not "merely the artist" (Def. Br. at 25) but a core member of the team and actively promoted the sale of the NFTs, the benefits offered by the Club, and the maintenance of the NFTs prices. The Complaint also alleges that Yosef has an ongoing relationship with Eden Fine Art, who "erected a 20-foot tall picture of Defendant Yosef on their Fifth Avenue Location, as Defendant Yosef proudly promoted on his Instagram account." ¶ 82. Such a display evidences that Yosef transacts business in New York through the sale of his artwork in New York.

When Yosef went to the party at Eden Fine Art on March 15, 2022, he was the guest of honor. As Eden Fine Arts described the event, "The invite welcomed the Meta Eagle community

to join Gal Yosef, alongside the rest of the Galyverse family, for a night of shared celebration, excitement, connection, and a raffle for an apple watch. The event took place at the Eden Gallery Soho location, in the heart of New York City."    ¶ 63 (quoting https://www.eden-gallery.com/news/meta-eagle-club-in-new-york-soho (available at perma.cc/RY26-F3EE)).  The pictures are still on the website.  *See* https://galyverse.io/gallery.

Defendants argue that this party has nothing to do with their statements about the project, but this ignores the fact that the Roadmap promised "IRL RNSNC x EDEN worldwide events/shows with artists."  ¶ 47.[15]  The updated Roadmap 2.0 expanded on this and previewed this party: "Events: Exclusive IRL and Metaverse events, the first of which will be this March held at EDEN Gallery Soho, NYC. We are in the final stages of organizing these events, working with an event planning team to bring you amazing experiences." ¶ 58.  Obviously, Yosef's involvement and attendance at the party "in the heart of New York City" was availing himself of the jurisdiction. *See, e.g.*, *Matter of People v. JUUL Labs, Inc.*, 212 A.D.3d 414, 415 (N.Y. App. Div. 1st Dept. 2023) (finding personal jurisdiction over out of state defendants who, *inter alia*, "personally attended JUUL's launch party in New York City" and were involved with "advertising on billboards in Times Square").[16]

---

[15]    In other words, "In real life events with Eden Fine Arts and their NFT company (RNSNC) as well as with artists."

[16]    Plaintiff believes that the Complaint sufficiently alleges a basis for specific jurisdiction, and the declaration from Yosef only confirms that he was in New York when he made his promotional statements and events for Meta Eagle Club.  However, if the Court is not inclined to find specific jurisdiction over Yosef, Plaintiff respectfully requests that the motion to dismiss be denied without prejudice in order to conduct discovery into the issues supporting general jurisdiction that Yosef has put into play with his declaration. *See, e.g.*, *Cerovene, Inc. v. Fukuzyu Pharm. Co.*, No. 24-CV-464 (RA), 2025 U.S. Dist. LEXIS 43236, at *8-9 (S.D.N.Y. Mar. 10, 2025) (denying Defendants' pending motions to dismiss without prejudice and with leave to renew after jurisdictional discovery is completed).

E.    **Defendants' Request for Attorney's Fees is Unwarranted**

Defendants' claim for attorneys' fees and costs based on alleged "gamesmanship" lacks merit and should be rejected.  Def. Br. at 26.  As the Second Circuit recognized, "Rule 41(d)'s purpose is clear and undisputed: to serve as a deterrent to forum shopping and vexatious litigation." *Horowitz v. 148 S. Emerson Assocs. LLC*, 888 F.3d 13, 25 (2d Cir. 2018).[17]  Neither of those concerns are at stake here.

*First*, Defendants make no effort to argue that Plaintiff engaged in forum shopping.  Nor could they, since Plaintiff filed this action in the same courthouse, Plaintiff filed a Statement of Relatedness that identified the *Aamer* action (ECF No. 3), and now this case is before the same Judge.  This simply cannot be forum shopping because the litigation remains in the same forum, on purpose.[18]

*Second*, Defendants do not explain how this could be considered "vexatious" litigation. "Though a showing of bad faith is not required, a court may refuse to impose [Rule 41(d) costs] on the plaintiff if it appears that there was a good reason for the dismissal of the prior action or that the plaintiff financially is unable to pay the costs."  *Gallo v. Inter-Con Sec. Sys.*, 20 Civ. 4879

---

[17]    *See, e.g.*, *Stidhum v. 161-10 Hillside Auto Ave., LLC*, No. 19 CV 1625 (ARR)(RML), 2022 U.S. Dist. LEXIS 37993, at *7 (E.D.N.Y. Mar. 3, 2022) (denying Rule 41(d) motion for fees where "defendants have presented no evidence of bad faith, forum shopping, or vexatious litigation by plaintiffs" and "plaintiffs did not face any unfavorable rulings prior to dismissal"), *report and recommendation adopted at Stidhum v. 161-10 Hillside Auto Ave, LLC*, 19-CV-1625 (ARR) (RML), 2022 U.S. Dist. LEXIS 124958 (E.D.N.Y. July 14, 2022); *Neurological Surgery, P.C. v. Aetna Health Inc.*, No. CV 19-4817 (DRH)(ARL), 2022 U.S. Dist. LEXIS 19744, at *13 (E.D.N.Y. Feb. 1, 2022) (denying motion under Rule 41(d)), *report and recommendation adopted at Neurological Surgery, P.C. v. Aetna Health Inc.*, No. 2:19-cv-4817 (DRH) (ARL), 2022 U.S. Dist. LEXIS 30759 (E.D.N.Y. Feb. 22, 2022).

[18]    Furthermore, the text of Rule 41(d) applies to plaintiffs "who previously dismissed an action."  The *Aamer* action was still pending when this action was filed.  Pursuant to the schedule set out in the Court's Order in this action on February 21, 2025 (ECF No. 5), a stipulation of dismissal without prejudice was filed in the *Aamer* action on February 28, 2025 (Aamer ECF No. 31).

(KPF), 2021 U.S. Dist. LEXIS 166061, at *29 (S.D.N.Y. Sep. 1, 2021) (alteration in original; quotation omitted). Plaintiff has already explained to the Court, at ECF No. 4, why he chose to file a new complaint as a new docket entry rather than file an amended complaint in the *Aamer* action. Defendants did not argue in this motion that Plaintiff did not have a good reason for filing the second related action.

Importantly, there is no explanation of how filing a new complaint in this action instead of an amended complaint in the *Aamer* action "caused Defendants to expend unnecessary attorneys' fees and costs." Def. Br. at 27.[19] They had already filed a motion to dismiss in that action, and there was nothing to do but wait for a new pleading. Further, as Plaintiff has already informed the Court, this "complaint will be treated as if the right to amend as a matter of course pursuant to Rule 15(a)(1) has already occurred" and any amendment "will be sought through leave of court or written consent of the" Defendants pursuant to Rule 15(a)(2). ECF No. 5. As such, the current complaint is equal to an amended complaint in *Aamer,* and there is no functional difference, and no additional costs incurred, by the Defendants' moving to dismiss the current complaint versus an amended complaint in *Aamer*. Furthermore, even if the Court were to consider awarding costs, "courts in this Circuit often limit costs and attorneys' fees to compensation for work that cannot be used in a second . . . action." *Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 255 (S.D.N.Y. 2020) (alteration in original). Here, Defendants have recycled large portions of their prior motion to dismiss briefing from the *Aamer* action. *Compare* Def. Br. at 14 *with Aamer* Action, ECF No. 26

---

[19]     Plaintiff has committed that any amendment of the complaint in this matter will be pursuant to Rule 15(a)(2). ECF No. 4 at 2.

at 14 (largely identical arguments on jurisdiction); *compare* Def. Br. at 6 *with Aamer* Action, ECF No. 26 at 5 (reviewing the same portions of the Terms of Service).[20]

Plaintiff chose to open a new docket number instead of filing an amended complaint after considering Defendants' jurisdictional arguments. This has not impacted Defendants at all, and therefore there is no reason to grant costs and fees pursuant to Rule 41(d).

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied. If the Court determines Plaintiff's allegations are deficient in any respect, Plaintiff respectfully requests leave to file a motion for leave to amend in accordance Rule 15(a)2) and this Court's individual rules, or seek jurisdictional discovery if necessary.

Dated: April 29, 2025                                Respectfully submitted,
      New York, NY

                                                    **WOLF POPPER LLP**

                                                    */s/ Matthew Insley-Pruitt*
                                                    Chet B. Waldman
                                                    cwaldman@wolfpopper.com
                                                    Joshua W. Ruthizer
                                                    jruthizer@wolfpopper.com
                                                    Matthew Insley-Pruitt
                                                    minsley-pruitt@wolfpopper.com
                                                    Terrance Zhang
                                                    tzhang@wolfpopper.com
                                                    845 Third Avenue, 12th Floor
                                                    New York, NY 10022
                                                    Tel: (212) 759-4600
                                                    Fax: (212) 486-2093

---

[20]    *See also Paulo v. Presse*, ACTION NO. 21 Civ. 11209 (JLR) (SLC), 2023 U.S. Dist. LEXIS 207171, at *21 n.7 (S.D.N.Y. Oct. 17, 2023), *report and recommendation adopted at Paulo v. France-Press*, No. 1:21-cv-11209 (JLR) (SLC), 2024 U.S. Dist. LEXIS 1207 (S.D.N.Y. Jan. 3, 2024) ("the Court notes that Defendants' submissions lack a categorical breakdown, let alone documentary support (e.g., invoices or receipts) for the individual costs incurred. This lack of supporting documentation provides a further ground for denial of the request for costs under Rule 41(d)(1)." (collecting cases)).

Max Burwick
max@burwick.law
BURWICK LAW, PLLC
43 West 43rd Street, Suite 114
New York, NY 10036
Tel: (646) 762-1080
Fax: (855) 978-2710

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April, 2025, a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system and was thus served automatically upon all counsel of record in this matter.

/s/ Matthew Insley-Pruitt
Matthew Insley-Pruitt

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Southern District of New York Local Civil Rule 7.1 and Section II.B.2 of the Court's Individual Rules & Practices, the undersigned hereby certifies that this memorandum of law contains 8,735 words, excluding the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates.  I utilized the word count of the word-processing program used to prepare the document in order to obtain that word count.


*/s/ Matthew Insley-Pruitt*
Matthew Insley-Pruitt